Good morning, ladies and gentlemen. Our first case for this morning will be Smith v. OSF Healthcare System in the United States. Mr. Gerrand? Gerrand. Gerrand. All right. Yeah. Good morning. May it please the Court. Matthew Gerrand for the Plaintiff's Appellants, who are participants in two pension plans that OSF Healthcare offers to its 18,000 employees in exchange for their many years of service. The plaintiffs appeal an order of the District Court granting summary judgment that the pension plans are exempt from ERISA as church plans. OSF, which is a religious hospital system, has relied on this exemption for church plans to avoid paying PBGC insurance premiums and to underfund the already accrued pension benefits of its employees by hundreds of millions of dollars. In doing so, OSF has deprived its current and former employees of the security and retirement that ERISA ensures for employees of analogous secular hospital systems. This is not what Congress envisioned when it enacted the church plan exemption. Why are you so sure of that, since exempting an entire group of plans from the protections of the statutes was certainly not done accidentally? They wrote a church exemption in, and without legally assured protections, it seems to me fairly obvious they would have known that you had to rely on something else, perhaps the church's responsibility or its goodwill or your willingness not to have a good pension or something. I think that's an interesting point, and I think the legislative history reflects to a certain extent that church plans, as they existed in 1974 when ERISA was enacted, were some of the oldest pension plans in existence and that the churches had long taken care of their employees. But I think what's critical here is that there's no church involved in this particular pension plan at all. Well, I mean, that's a matter of definition, isn't it? Didn't you lose like two-thirds of this battle a couple of years ago when the Supreme Court decided that the position this court had been taking in the Advocate Care Network case was not the correct one? I don't know if I'd characterize it as two-thirds of the argument. All three-quarters. All of it? We lost the issue that was related to the Supreme Court. If you had won, this would be over. Yes, exactly. The issue before the Supreme Court was a narrow issue of statutory construction. The Supreme Court in the Advocate Health Care case decided the threshold question of whether a church plan that is maintained by a so-called principal purpose organization, this is subparagraph 33C1 of the church plan definition, it describes a plan maintained by an organization, a church-associated organization that has a principal purpose or function of administering benefit plans for, administering or funding benefit plans for church employees. And what the Supreme Court evaluated in its narrow opinion in the Advocate Health Care case was the narrow question of whether a plan maintained by a so-called principal purpose organization must have first been established by a church. And it said no. Right, it said no, and that's over. But could I ask you, who is legally on the hook for your client's pension obligations at this point? So the trust that holds the assets must pay the benefits. Okay. It has discretion as to whether it pays, doesn't it? No, it does not. It does not, okay. So this is a defined benefit pension. So the employees have already accrued these benefits, and the benefits, they've done their part. They've worked their time. Okay, but it's the trust. It's not the church. It's not OSF. It's a trust that holds assets, and the problem here is that the trust holds assets. Because OSF has been claiming this church plan exemption for Marissa, the trust holds assets sufficient only to fund about 55% of the value. And who are the trustees? I'm not sure I know the answer to that off the top of my head. The trustees are appointed by the trust company that's appointed by. By the committees? By OSF? By the order? So OSF is a health care corporation. OSF enacted the plan document. So there's a plan document that OSF enacted the plan document. It made the benefit commitment. It is responsible for putting money into the trust to fund the benefits. It wrote the document that determines the rules of benefit accrual, the rules of benefit eligibility. It appointed the committee to administer the plan expressly on its behalf. And when you say the committee, you mean this committee you're complaining about that consists of sisters of these two orders, et cetera? They're internal committees to OSF. But they're fiduciaries, right? They are the fiduciaries. But part of the problem here is that the church plan definition is very narrow. The church plan definition allows only two types of entities to maintain a church plan. This is not in dispute. The parties agree that OSF, as a health care corporation, cannot itself maintain a church plan. Only a church, only two types of entities can maintain a church plan, a church pursuant to subparagraph 33A of the church plan definition or a principal purpose organization pursuant to subparagraph 33C1. And there's no dispute that OSF is neither type of entity. It is not a church. And it does not have a principal purpose of administering or funding benefits. It's a health care corporation. And so the part- But everybody agrees with that. It's these committees that are doing it. I think the question Judge Hamilton asked you is a very relevant one. And I'm not sure where you find in the statute the notion that the committees aren't an appropriate type of organization to be a principal purpose organization, as advocate health care use that term. I think you have to interpret the language of subparagraph C1 in the context. So Congress was very clear that, as I said, only two types of entities can maintain a church plan. And there's no real dispute that a hospital system cannot. So what OSF is trying to do is use its own internal committee to do what OSF itself cannot. So I take it that you wouldn't have any argument at all if OSF had simply created some juridical entity as opposed to these committees that it has to administer the plan. Well, a couple things to unpack in that question, I think. So you use the verb administer. And as we explain in the briefing, administer and maintain have two distinct meanings under OSF. I'm well aware of that. And I have to tell you I was not wildly impressed with the idea that, for risks of purposes, only organizations that had the power to create a plan, to terminate a plan, to amend a plan, counted here. I don't see any cases that ever said that. But the problem is that ERISA uses the verb maintained to describe the plan sponsor, whereas ERISA expressly uses the word administer to describe a fiduciary act, to describe a fiduciary function. So administration is the fiduciary act of interpreting and applying the plan's written terms. I know that's the definition you're urging, but I am saying that a normal person reading the word maintain might think that meant you're accepting applications, you're ruling on them, you're handling it day-to-day, which I know ERISA sometimes calls administering. But why is that not within the scope of what these organizations can do? So is it within the scope of what the committees can do? Maybe. Well, in a common sense matter, it means the committees or the structure over which they sit. I realize that I'll assume favorably to you that the actual people who sit in these committees aren't going to work every day and working on ERISA plans. But there's somebody who's doing this. Your opponents say that no one's ever missed a payment, as a matter of fact. So that's a fact that nobody's ever missed a payment is a distinct question from whether or not ERISA protections apply. I agree with that. I'm just saying that something's happening. So at least up until now, I think your fear is a future fear, as would be true for any underfunded plan, that there will come a time that the plan runs out of assets and people will be left with nothing instead of the retirement benefits they were promised. That is the fear. District Attorney, let me ask you. I think all of us understand these issues reasonably well. But I'd like to follow up on something Chief Judge Wood asked you a moment ago,  and specifically whether it would be sufficient if the employer set up a not-for-profit corporation rather than a committee, a not-for-profit corporation with no assets but the designated assignment and purpose to maintain and administer the plan. So the question of what I think would satisfy subparagraph 33C1, I think an example of what satisfies that is denominational pension boards. I know that. Okay. Please answer my question about whether that not-for-profit corporation without assets would comply with your reading of the statute. A not-for-profit corporation that has no assets could be a principal purpose organization? Yes. It's only purpose is to administer the plan. It's only purpose is to administer the plan. Correct. The definition of a principal purpose organization uses the disjunctive administer or fund. So a principal purpose organization need not fund the plan. It can merely administer a plan. So there could be a disjunctive organization. I take it your answer is yes. It is yes. The not-for-profit corporation would satisfy. How would that make your clients any better off than the current situation? So the problem here is that I think the premise, there's a hidden premise in the question of can a hospital create this separate organization. And I think the issue here is that. Anybody can set up a not-for-profit corporation. But a hospital cannot sponsor a church plan. A hospital cannot maintain a church plan. So if there is a distinct corporation that is making the benefit promise, that is, if a corporation has been set up, regardless of who sets it up, and that corporation is actually making the benefit promise, is actually committing to provide benefits. No, it's not making the benefit promise. It's simply administering the plan. Then there's an argument of what, so it may satisfy as a principal purpose organization, but it may not actually maintain the plan is the problem. So those are two distinct requirements in subparagraph C1. A plan qualifies as a church plan only if it is maintained by a principal purpose organization. But an entity qualifies as a principal purpose organization if it has the principal purpose of an administration or funding. So there are two distinct parts of subparagraph 32C1. Can I ask you about your Rule 56D argument? Of course. As you know, we review those sorts of decisions by district courts for abuse of discretion. Yes. And I'm, frankly, pretty troubled by the district court's handling of this whole matter. But I'm also concerned that if we were to send this back for an opportunity for more discovery, that we would be imposing on everyone a lot more time and money without being clear as to what purpose might be served. My question is, if we were to vacate and remand on 56D, what would your dream find look like in discovery? What do you think should convince the courts that these two committees are just shams? Sure. I don't know if I'd go so far as to use the word sham. But I think we would want to take discovery. We would actually want to talk to the members of the committee and ask them what functions they actually serve. What activities did they actually do? Were they actually administering the plan? Or the alternative, as we suspect might be the case, were the employees of OSF actually doing the administrative work and actually doing the work? Can the committees, do they have the power to delegate administrative functions? They may have the power to delegate, but this goes back to the, like, it cannot possibly be the case that Congress would limit who could maintain a plan to only two types of entities, allow an unqualified hospital to delegate an internal committee to satisfy the principal purpose restriction, and then allow that committee to then delegate the authority right back to the hospital employees. Why is that so wrong? If the committee has the authority to supervise what the people working for it, why are hospital employees so much worse than, let's say, account temps, or somebody else who comes in from the outside? It's not about the particular qualifications of the employees. It's about what the statute allows. Right, so they get their paychecks from the hospital as opposed to from some other source. Why is that critical? If the right supervision, they're doing it within the boundaries of the plan. It's all about what the statute allows. I mean, Congress did not create a religious exemption for church for all. Congress did not create an exemption for all religious entities. They created an exemption for plans maintained by churches and plans maintained by organizations that administer and fund benefits for church employees. This is far outside of the, you look at the legislative history and the floor statements. This is far outside of anything Congress talked about. Senator Talmadge and Representative Conoval, to the extent they talked about employees of hospitals or other church-associated organizations, they were very clear that they were talking about the need to allow church plans, plans established and maintained by churches, to continue including agency employees within the church's plan. They talk about the need, how church employees and clergy, lay employees of churches and agencies and clergy have a special need, a unique need to be included in one single plan. To the extent they talk about agencies, they expressly talk about how because church agencies are reliant on tithes and other offerings, they couldn't afford to comply subjection to ERISA. And they expressly, the legislative history talks about how unlike a business that can pass the added costs of ERISA compliance on to consumers, an agency is not able to do so because, again, it's reliant on tithes and other offerings. So all of that suggests two things. One, that the congressional concern had nothing to do with a multi-billion dollar corporation like OSF that certainly can pass the costs of ERISA compliance on to consumers. But additionally, it strongly suggests that Congress did not at all envision these stand-alone plans for hospitals. How long have these stand-alone plans been in existence? So the subparagraph C was amended, was added to the statute in 1980. The private letter ruling started coming out in the 1980s. Correct. No secret about any of this. And there's been no action by Congress, has there? There's been no action by Congress, but I don't think this rises to the level of congressional acquiescence. There's no formal notice and comment rulemaking. There's no formal action at all. These are expressly non-precedential opinion letters. And in terms of the no secret, I would note that it wasn't until 2011 when Congress, excuse me, it wasn't until 2011 when the IRS amended its procedures to first require notice to the employees of these hospitals that their employer was even seeking an exemption from ERISA. Prior to that, all these letters were issued. It was not an adversary proceeding. There was no discussion of the actual elements of the statute or any of the arguments we make in the briefing or we've talked about today. They were simply these one, you know, the hospital goes to the IRS, asks for a letter, letter issued, end of story. And that did not provide, employees largely had no idea this happened until, you know, recent instances in which church plans started to fail. And, you know, we note those in the briefing. And that's largely why we bring this case now. It's like the whole purpose of ERISA, you know, the large motivating factor in enacting ERISA was pension plans of large employers like this failing once people, once employees reach retirement. It's too late for them to go back to work and earn more money for retirement. They've been relying on these defined benefit pensions for their entire career. And they get to retirement and suddenly the plan falls on hard time and there's no assets. That is precisely what ERISA was enacted to prevent. And this is an instance that's, you know, like I said, especially in this case, these plans have been frozen for a while now. There's been no new benefit accruals. And yet OSF still has only funded 55% of the already accrued benefits. Okay. If you want to save your last minute. Sure. This would be a great time. May it please the court. I'm Brian Ortelier for the OSF Appalese. I think I should note that we've ceded 14 minutes of our time to the government to talk about and address the constitutional issues. And I'm going to limit my remarks to the statutory construction issues. I think it's useful to follow up on some of Judge Hamilton's points and observations. And certainly the plaintiff's appellants vigorously argue that the amendments in 1980 were meant to sort of accommodate the peculiar pension board sort of design, which are largely a Protestant phenomenon. And it's important to note, as we point out in our brief, if you look at these things carefully and dissect them, basically what you have in these pension board circumstances is you've got a separate corporation administering the plan. Could I ask you though, I mean, I understand the pension board situation. Is it your position that it would be fine as a matter of statutory compliance if you just named a committee in an internal press release, seven names, and those people never sat down and did anything together? They never took a single step in the direction of administering the plan. There was some plan administration department at the hospital that happily moved forward and processed retirements as they came along or whatever other triggering events there were. How far are you pushing this? I'll just say not that far, Your Honor, because that's not the facts and circumstances here. We have these administrative committees, which are in all material respects indistinguishable from the way ERISA works. But see, that's where discovery was cut off, right? That's what you say, but don't we need to take the facts in the light most favorable to your opponent? I'll simply point out, as I think Your Honor did while the appellants were making their remarks, the plan is paying benefits. There's no complaint from anyone that they're not being paid. So far, so good. You said on the jump off the building. What you have is a laundry list of tasks. I think they're itemized in our brief. And there's no allegation by these folks that these tasks are not happening. And equally importantly, Your Honor, there's no allegation. Because what you're looking at really at the end of the day under advocate, who primarily manages or administers these plans, and they want to say OSF. And OSF, the corporation, can't qualify. They don't allege, nor could they, that the corporate sponsor is doing these things. But here's an important piece. And I'm sorry. I thought of this last night. It's not in the brief. There's provisions in both plans. Their singular argument really is that the committees aren't meeting. Again, there's no meaningful allegation that the stuff's not getting done. All those lists of items. Right. Are these sisters administering? They're not administering. No, the tasks are delegable, Your Honor, pursuant to the plan's terms. The tasks are delegable. And they don't have to meet under the terms of the trust. So they don't have to do anything. You just have to have a memo to file. Here are the people who are our nominal committee. But actually, at that point, we've done all we need to do. Well, I think that, again, it really isn't the record. The plaintiffs have the plans with all of the duties. They also have the minutes next to it. And they're certainly aware in conversations with their clients whether and to what extent things are properly being done. Your position, counsel, though, seems to be, in the way that this litigation was run, that once you've produced those documents, the case is over. That the plaintiffs are not entitled to take the depositions, which they had noticed before you filed your motion for summary judgment, of committee members to find out what was going on. And while 56D decisions are usually given abusive discretion review, at least my review of the case law suggests that appellate courts tend to be reasonably willing to vacate and, say, give these folks some more time in circumstances like this, where there's a sudden switch in the schedule. Maybe I can take a momentary step back. First of all, what we have is a nonprofit corporation, OSF. There's no dispute, by the way, although there have been rumblings. We argued in the district court that this enterprise is controlled by the Roman Catholic Church, and the district court so found. There's no challenge to that on appeal. We're left with this singular question, what is the meaning of 33C1? Now, by all accounts, what we do here is we look at the tasks, and frankly, their argument is OSF, the corporation, is primarily managing this plan. But first, they cite only settler functions, which under Pegram, Verity, and the wealth of cases, and your honor, we found an opinion this morning where you adopted Pegram talking about the two hats doctrine. You have two tasks that they identify. What they say in the first instance is that OSF established and amended the plans. These are settler functions. They're not relevant to the tallying up we're going to do. Next, they say OSF is funding the plan. By the way, in the first instance, the committees determine the funding level, and based on investment performance, that may run to zero. So you've got one side of this ledger as we try to look who's primarily running this plan here. I'm coming to your question, your honor. How are you responding to my question? No, I'm getting to the other side of the ledger. So we have these tasks. And the facts. I mean, you know, you're saying all of this. I'm sure you believe all of it, but they wanted to look into the record to find out what are the committees doing. You just now made a statement. The committees are handling all of these things. Maybe they are, maybe they aren't. We don't know that because a timely notice deposition never happened. I need to point out, and I didn't get there, in both plans, by the way, they specifically state, and in the St. Anthony's plan, section 11.2, the committee may act with or without formal meetings, and the St. Francis plan in 9.02. So we have no evidence that that happened. I could imagine evidence, you know, email chains or something, but there's nothing. Except, Your Honor, there's no challenge, other than to sort of this larger funding problem. And, again, Congress said. But there's a generic challenge to whether these committees, as required by 33C1, are, in fact, maintaining the plan. Are they doing enough things? And it's troublesome that, well, we don't know what they're doing, number one. And although it's well established how one would check the actuarial soundness of a plan, there doesn't seem to be anything in this record to suggest that this is an actuarially sound plan as opposed to a plan that hasn't skipped payments yet. Well, by the way, that's sort of at the threshold question, is whether or not state law determines the funding standard, and the committee does, in fact, defer to expert actuaries to determine its funding requirement under state law. How do we know that? I believe there's references in the minutes to sort of the funding question. The plaintiffs are complaining at the end of the day, and it is a frozen plan. And make no mistake, the administrative work around a frozen plan, there are no new participants, there are no further accruals. It's a different world. It's a different ball game. There's fewer tasks. For example, both the district court and Medina really talk about the structure. Both plans talk about determination of administrative benefits claims. In other words, under 502A1B, and this is something of an analogous situation, if a participant is unhappy, perhaps, with the calculation of their benefit claim, they bring it to the committee. I think in the record there's one or two instances of that. But otherwise, you can readily infer that the participants are satisfied with their payments, so there's no benefits claims to be considered administratively by these committees. Well, of course they're satisfied until they're missed. And again, Your Honor, that gets back to the policy determination. And Congress, I mean, this is our- Congress just should have said, if you are foolish enough to work for a church, you should realize that the rug can be pulled out from under you at any time. Go ahead if that's what your preference is, but we're not making any promises. That's the reality. Maybe state it a little differently, Your Honor. What the plaintiffs argued in Advocate is that this mechanism created a gaping hole in ERISA's coverage. And I'm just saying so be it. Okay, well, I just want to underscore that they've lost that argument. But what the Supreme Court said was, you know, you didn't have to have this link, but I'm saying the logical consequence of that is that you don't have promises worth the paper they're written on. I think that's an overstatement, Your Honor. And again, there is a robust body of state trust law that governs here. Why are you subject to that, given the First Amendment? That is well beyond my scope of expertise, frankly. Well, I don't see why. Maybe the government lawyer can help us on the Constitution. But my point is, they are subject to state law. There are many carve-outs in federal law that make an enterprise subject only to state law. And importantly, we've entered into a tolling agreement. This isn't in the record with these folks. They fully intend to sue us under state law. And again, OSF, as the settlor sponsor, there's no allegation that somehow the nonprofit is imperiled. It has a secondary guarantee of the benefit obligation and stream. But this is, again, this is what Congress sort of intended with this language so long. I worry about congressional intent. I actually have to say, I look at all of these statements in the record, and this strikes me on both sides as literally the worst form of legislative history. You don't have to be all the way at the Justice Scalia end of the spectrum to worry about random statements from Senator Talmadge. Your Honor, I think it's me that all legislative history is the worst form of it. Justice Eastbrook, I've read your opinions on the point many times. Let me go back to the discovery problem here a little bit. You seemed a little surprised. I thought that the district judge did not grant relief under 56D. Your letter to plaintiff's counsel of January 5, 2018, in essence, proposes negotiations about the scope of whatever discovery might be needed to respond to the motion for summary judgment. And then, lo and behold, you oppose any discovery, and the district judge buys that argument. No, Your Honor. It frankly puts this whole judgment in some jeopardy as far as I'm concerned. Again, at the threshold. If you look at what the Tenth Circuit did, they basically said what is the structure? Counsel, if the Tenth Circuit is right in every respect, then probably there's no need for discovery. But having one circuit decision in the country that takes that position extremely in your favor doesn't necessarily give me comfort that there's nothing more to talk about here and that everybody has to take the papers at face value. Well, again, Your Honor, and when the district court ruled in our favor, it wasn't lost on me. And again, our position generally was this nonprofit should not be subjected, and I think it's implicit in this type of statute, to the very expensive burdens of a risk of class action litigation. It is costly. It is onerous. It is far-reaching. That's a given in this type of case. We showed the structure. Again, I'm asking what is it we didn't do? This plan is moving along steadily. But you've disclaimed some of the extreme examples that I've offered to you. And without the discovery, we don't know what the reality is of what's going on. Whether it's my extreme example of the memo to the file or whether it's your proffer that everybody is toiling away in these organizations assiduously. I don't know what they're doing. It might be useful for a moment, Your Honor, to consider again what the plaintiffs conceded sort of in the run-up to this appeal. At the threshold, there is this question associated with or controlled by, which extends in part to the fact that the sisters religious of this organization constitute the board of directors and the administrative committee. And again, there is a body of minutes considered next to the plan documents that show this committee, first of all, is populated not haphazardly. And that it barely met. I'm sorry? That it didn't meet very frequently. The documents themselves specifically say, A, tasks are delicable. It's very common in the benefit plan administration world. Yes, at some point, you have a plan frozen to new approvals. You set it up. You meet as needed. There are no new participants. There are no benefits claims. The acts are delicable to others and to other individuals. And both plans say, it's very, very common. This language is similar to the standard ERISA plan language that you don't have to have formal meetings to act. So what we have to consider as well is the very, very peculiar design of this enterprise, along with its fiduciary committees, which, by the way, despite the argument that there's some lack of separateness, are structured exactly as ERISA plans work, subject to the two hats doctrine. All concerned understand, and both plans make this abundantly clear, that people act in the best interest of the participants. Counsel, just very quickly, which entity names the committee members and has the power to change their appointments? I will just give you the answer generally how this works. Under most plans, I don't think I went back and looked here, but I would suspect it's the same thing. You're going to guess. Is that what you're telling me? It's a very informed guess. This is all I do for a living, and I'd be very surprised if it were otherwise. And if you would like, Your Honor, we'll send you a letter later today. Maybe a letter would be better than an informed guess. So I should send a letter? Yes. Who appoints and who removes the committee members. Okay. Fair enough. Thank you. All right. Thank you. Mr. Sturgill. Good morning. You may please record. I'm Lowell Sturgill from the Department of Justice representing the United States. The United States intervened in this action to defend the constitutionality of the Arisola Church Plan exception, which the plaintiffs challenge only as applied. So the court should reach the constitutional question only if it first finds that OSF does qualify for the exception, and that's an issue that the United States has not taken a position on. All right. I understand that. Let me ask you. This is really for my edification. We recently decided a case dealing with the Parsonage exception, the Gaylor case, and the opinion in that case very clearly sets out that there really are a whole family of related tax exemptions dealing with housing for the convenience of the employer, and it explains why giving a house in kind isn't really terribly different from giving money, etc. So I want to know whether anybody other than religious institutions get this exemption or whether this is unique in the tax code. So there are brief sites, other exceptions at page 4, note 4. There are exemptions for government plans, plans that comply with workman's comp plans. And are they completely exempt from ERISA just in the same way that this church plan is? I saw that footnote, but I... So I'm not sure, to be honest. We just noted that there are exemptions. So you can't tell me anything about the exceptions that you cited? Well, I can tell you that they're not as broad as the exemptions that the court referred to in Gaylor. So we're not arguing that these exemptions by in and of themselves in a similar way that the exemptions in Gaylor did. I mean, in Gaylor, it's very clear religious institutions are part of a family of similarly situated institutions. Right, so we're not making that argument here with respect to... So this is really, this is just for religion. Right, and our point about Gaylor is that although Gaylor did mention that as one of the grounds for upholding the religious exemption in that case, it also went on to say that the exemption as amended to include in-kind cash contributions avoided intruding on church's decision-making about how they wanted to structure their affairs and pay their parsonage exemptions. So our point is that this, Congress's extension of the church plan exemption in 1980 achieves the same purpose. It essentially gets out of the business of telling religious institutions how they're supposed to go about and structure the maintenance of their pension plans. But you know, that argument goes pretty far. Your opponents say that these hospitals and the plans are already subject to very extensive financial regulation. And so whatever intrusion is going to happen has already happened. There's no marginal intrusion from insisting on compliance with ERISA. Sure, our response to that is that accommodation can be lawful even if it doesn't lift a marginal... What's in a combination with? I don't understand that. If there's no marginal intrusion, then why do we... Right, so... What's wrong? So the Congress is entitled to lift burdens that its own statutes would impose on these institutions. And that is the way the accommodation doctrine works. No case has ever held that there's no burden, that the Congress can't lift a burden that a federal statute on its face imposes merely because there may be other state laws that might also... Counsel, most of the intrusion that plaintiffs are talking about comes through the health care financing system. It's so elaborate and reaches in so many respects. Is it also true that this church plan exemption would extend to, for example, educational institutions that are associated with or controlled by churches? So we haven't taken a position on how that would apply. All we've said is that if you have a plan and you decide that the plan meets the terms of the statute, then that is constitutional because the terms of the statute are a permissible accommodation. I was trying to throw you a rope on this question because it seems to me that the plan exemption would extend to educational institutions. Maybe I'm wrong about that. And there's a lot less federal oversight of the financing of, let's say, religious colleges and universities than there is of religiously affiliated hospitals. I'm not authorized to answer the question because we're just here. I apologize. I'm going to say that's a real limitation on your position, which is not particularly wise because churches, if they are in any space other than just being a church, they do two things. They do health and social welfare sorts of things on the one side, and they do education on the other side. I can think of countless positions that the United States has taken, whether it's about vouchers or whether it's about busing or whether it's about what kinds of health plans are going to be offered. There are many educational institutions in this country, from the kindergarten level on through post-secondary education, that are every bit as church-affiliated as this hospital is with the two orders. So I take your point, Your Honor. I also note that in the Amos case, the Supreme Court upheld a religious accommodation to the religious discrimination in hiring provisions that applied to a religious gymnasium. So if that was good enough for the Supreme Court, then this should certainly be. I'm just surprised you're not authorized to think about this subject as a whole because I can't imagine the Supreme Court, at least, writing an opinion saying this opinion is good for hospitals, but it's not good for universities. That's not the way the court approaches these things. So again, these are... I mean, it makes your argument weaker, to be honest, because it means we've got to turn calisthenics to take your position if it's not some generic First Amendment doctrine. I have to disagree with that. I think that the Gaylor case and this Courts Cohen case and Amos itself make it absolutely clear that this provision is facially constitutional. I don't see any differences. Again, Congress has done... Well, I've just told you what one of the differences with Gaylor is because there is a certain thing. Think of Rosenberger against the University of Virginia. There is a line of Supreme Court cases that say you can't discriminate against an institution just because it happens to be religious. It's certainly entitled, at a minimum, to equal treatment. And our Gaylor opinion says if you're going to give other people housing for their key personnel, you can do it for churches. So with respect, that's one of the things that Gaylor says, but I think that... It's the primary thing. They go on and on about it. Actually, I don't agree about that. I think there are three independent reasons, and the two other reasons map exactly and perfectly onto this case. Again, Congress, in the same way that in Gaylor it got out of the business of telling churches how they are to go to provide a percentage of benefits, whether in-kind or in cash, and also that provision eliminated discrimination among religious denominations, the 1980 Amendment does the same thing, right? Because, as Congress explained, the prior rule, which only allowed churches to do this, discriminated against Protestant congregational organizations that didn't have a hierarchy, so they needed to use outside pension boards. So, again, I think there were three independent reasons in Gaylor, and the second and third ones completely map onto this case. So what do you see the entanglement if the church plan had to comply with ERISA? Why is having an actuary assess your plan to see if you have enough money to pay future claims entanglement? Isn't it just running a computer program? Well, it's a sort of oversight, the continuing oversight and intrusive oversight. No, you're saying these words, but why if once a year somebody had to say how many assets are in the plan, how many people, what are their ages, is this an actuarially sound plan? And then at the end of it, maybe the answer is no, and you say to the church, no, this plan is not actuarially sound. The church says, we don't care. Well, two things. First of all, it goes beyond that. Under the statutes, the inquiry would go to, they have to look at particular transactions, and those transactions could reveal confidential decisions about how they want to spend their money and to which missionaries or however churches do these sorts of things. So there could be confidentiality concerns, which I know the legislative history is terrible, but that's picked up in there as well. So we'll strike that and just say there are confidentiality concerns that this could bring up. And then the second point is this restricts, their fiduciary standards restrict investments. So you don't think churches can be susceptible to any confidentiality rules? I did not say that. Not all these priest abuse cases. What I said here is Congress made a voluntary decision to step out of the business of regulating churches in this context. The plaintiffs misread the cases. They say that this is all about whether churches have a right to demand that they be exempt, and that's where your point, I think, is relevant. Congress doesn't have to exempt, but here it chose to. And actually, Amos, if I could make one more point. One more point. Amos applied a rational basis test to the question of the means and spit on an otherwise permissible accommodation, and if that's the applicable test, which I think it is, then I think these questions easily satisfy that. All right. Thank you very much. Thank you, Your Honor. Mr. Garrett, I'll give you a little bit of extra time since we ran over. I think you wanted three minutes. We'll give him three minutes. Thank you, Your Honor. I'd just like to address a couple things on the maintain argument. Counsel made reference to the Supreme Court's discussion of the entity maintaining a plan as the entity with the primary ongoing responsibility and liability to plan participants. And the Supreme Court was interpreting the very statutory term at issue before us. And as between OSF and a committee that met for only 70 minutes in an eight-year period or a committee that met only twice during an eight-year period, it's hard to avoid the inescapable conclusion that OSF is the one with the primary ongoing responsibility. The district court in saying, in I think a footnote, maybe not, the district court made reference in addressing our argument that the committee met infrequently said, well, it doesn't matter if the committee performs its job well. All that matters is that it has the right structure. But, again, the subarea 33C1 does not talk about a mere structure. It uses the verb maintain. The plan qualifies as a church plan only if it is maintained by a principal purpose organization. And the Supreme Court, interpreting that provision, said that requires the primary ongoing responsibility. So you're essentially saying if you're putting all your eggs in the basket that these committees are the principal purpose organizations, the committees have to do something. Absolutely. Is it your position that only one organization or entity can maintain a plan? I think, yes. So the Supreme Court said primary. That suggests the first and foremost, right? The entity that has the primary responsibility. Well, it's a primary purpose. It's not a primary committee. Excuse me. So there's principal purpose in describing a type of entity. That's the language of 33C1. But then the Supreme Court, in interpreting the term maintained, said that it's the primary ongoing responsibility. I'll address Your Honor, Judge Hamilton's point. I don't think it's actually merely a passing comment. The court was evaluating. The court was indicating that only one entity can qualify as a maintainer of a plan. It was evaluating the relative. Because the statute allows the organization to satisfy that if it is funding or administering, right? And those are usually two pretty separate operations. Again, there's two parts of subparagraph 33C1. So an entity qualifies as a principal purpose organization, in the words of the advocate opinion, if its main job is administration or funding, but a plan qualifies as a church plan only if it is maintained by the entity. So administration or funding is not redefining the verb maintained in the context of 33C1. The verb maintained in the context of ERISA has a very specific meaning, and it refers to the role of the plan sponsor. A plan sponsor is the entity that makes the benefit commitment, designs the terms of the plan. Counsel talks about settler functions. What he's talking about are the settler functions belonging to a plan sponsor. So only a plan sponsor can maintain a plan. That's how you read this. That is how ERISA uses the term maintain. Okay. Thank you very much. Thanks to all counsel. We'll take the case under advisement.